Nelson, J.,
delivered the opinion of the court.
This . action of forcible entry and detainer was commenced before a justice on the 1st of June, 1870, after the passage of the Act .of 9th February, 1870, c. 64, Shankland’s Statutes, 124. Judgment was rendered against the defendant on the 24th of August, 1870, and the cause removed into the Circuit Court of Bradley county on a petition for writs of certiorari and supersedeas, and a fiat granted by Hon. John B. Hoyl, Judge, on the 24th of September, 1870. The motion to dismiss the petition was properly overruled, although the . petition contains no good reason for not appealing. ' Under the Code, s. *125 3124, as well as tbe uniform course of decision prior to its adoption, the petition for certiorari, when this remedy was resorted to as a substitute for the appeal, was required to show, as a general rule, some good reason for not appealing within the time prescribed by law: 1 Meigs’ Dig., 164; McMurry v. Milan, 2 Swan, 178, 179. But no such rule has been established in regard to this and similar actions for forcible or unlawful entry and detainer, &c.; and in construing-the Act of 1821 and subsequent statutes, it has been held that their object was to authorize the Circuit Court to re-try the issue of fact, upon an allegation of merits alone, in the petition, and without requiring the petitioner to assign reasons for not appealing: Lane v. Marshall, Mart, and Yerg., 258; Edwards v. Batts, 5 Yerg., 442, 443.
The reason for the distinction between petitions for certiorari and supersedeas in forcible entry and detainer cases and other actions, was that no appeal was given by the original Act of 1821, c. 86, Car. & Nic., and no writ of possession cóuld issue until after the lapse of twenty days from the judgment, within which time the parties could remove the cause into the Circuit Court by certiorari, under the Acts of 1821, e. 14, s. 13; 1822, c. 35, ss. 2, 3; 1841, c. 86, s. 6. See 1 Meigs’ D., 534, No. 985; Nich. Sup., 165, 168; Earl v. Rice, 10 Yerg., 233. An appeal was first authorized in such cases by the Act of 31st December, 1849, c. 131, s. 3, within five days, and, as in other cases, by the Act of 7th February, 1850, c. 74, s. 1. The last named provision was re-enacted in the *126 •Code, s. 3360, which allows the appeal within the two days allowed by law as in other cases; but under •s. 3361 no execution or writ of possession could issue until after the lapse of five days from the judgment. Under s. 3362 either party could take the case into the Circuit Court by certiorari at any time before the writ of possession was executed, on the terms therein prescribed; but no allegation of merits or excuse for not appealing was required.
The Act of 9th February, 1870, among other changes in the law, authorizes the writ of possession or restitution to be awarded immediately, provided that, if the defendant prays an appeal, the plaintiff shall execute the bond therein prescribed, conditioned that he will pay all costs and damages which may occur from wrongfully enforcing the writ, etc., and authorizes the removal of the proceedings into the Circuit Court within thirty days by petition for writs of certiorari and supersedeas, and directs the Judge to grant said . writs if merits are sufficiently set forth, and to require bond and security, etc. Under this Act it is necessary, if the remedy by petition is resorted to, that the petitioner shall, in his petition, present a merito-ridus case; and we hold that the petition in the case now before us is sufficient, as it alleges that petitioner was put into possession by L. H. Hughes “about the beginning of the year 1870, and that Hughes and his vendors held possession of the premises in controversy "Tor more than twenty years previously.”
This brief review of the statutes and previous decisions is deemed proper because this court, on hear *127 ing tbe argument, was at first inclined to the opinion that the petition should have been dismissed because it does not contain any good reason for not appealing,
It appears from the evidence that the house and lot, which seem to be the real subject of controversy, are situate near the dividing line between two quarter sections of land claimed respectively by the plaintiff\ Elliott, and L. H. Hughes; that defendant alleges he was placed in possession by the agent of Hughes, and that this line was not actually run by any person other than the plaintiff, or by his procurement, until after the commencement of this suit, when Blackburn run it, “drove down a horse-bone,” and made what he styles “the horse-bone corner.”
The plaintiff, in his evidence as a v,fitness, did not claim to have had the actual personal possession of the land, but alleged that he first held possession of it by Sally Epperson as his tenant, next by Elizabeth Tucker, to whom he made a deed, which was can-celled in March, 1870, and that defendant told him he had rented from her in case the house “fell” on her side of the line, but if the house was on plaintiff’s side he would be his tenant. The plaintiff further stated that he had procured Blackburn to run the line before the commencement of this suit, and that by this survey the house was “thrown” about four or five feet on plaintiff’s side of the line. Blackburn proved that he made the survey both before and after the commencement of the suit, and that on the last survey the line “went through the house at one corner and out at the door, which left the greater part *128 of the house on Elliott’s side.” The defendant proved that Cantrell had entered the land in 1841; that he and those claiming under him, of whom defendant is one of the persons, had held possession ever since that time; that Sally Epperson was one of the tenants under that title and sustained that relation in 1868, when she attorned to plaintiff; that Moreland next rented the land under the Cantrell or Hughes title for the year 1869; and that defendant took possession under L. H. Hughes, who claimed under the same title, “at wheat sowing time in the fall of 1869.” The defendant admitted in his evidence that he had told Mrs. Tucker that “in case the house fell on her side and she gained it, he would pay rent to her.”
The record details an agreement between the parties on the trial as to the deeds and grants under which the adjoining quarter sections are claimed, and it is quite manifest, from these and other facts appearing in the record, that this action of forcible entry and detainer is an action of ejectment in disguise, and that its real object is to try the title to the house and premises in actual controversy.
It is urged in argument that his Honor erred in instructing the jury that “the plaintiff .can not maintain this action unless he shows that previous to its commencement he had been in possession of the disputed premises either by himself, tenants or agents.” If there is any error in this charge it is in favor of the plaintiff; as it seems to imply that he could maintain this action if he held possession at any time. *129 before suit brought either in person or by Sarah Ep-person or Mrs. Tucker. By the Code, s. 3354, as well as by previous laws, it is expressly directed that “the estate or merits of the title shall not be inquired into.” This is a pure possessory action. If Sarah Epperson or Mrs. Tucker was in possession when defendant took possession, the suit should have been brought in the name of the tenant and not of the landlord, if the tenant was wrongfully ousted. If the possession was vacant and the defendant entered peaceably and for himself, without any connection with the plaintiff, or if he succeeded More-land and held under the Cantrell- or Hughes title, then ejectment should have been brought to try the title: Bird v. Fannon, 3 Head, 14; Greer v. Wroe, 1 Sneed, 247. And if, as appears from the record, the defendant entered as tenant of Hughes, he could not, during his tenancy, attorn to the plaintiff and become his tenant without the consent of Hughes, and the plaintiff could not, in consequence of such attornment, maintain this action.
It does not clearly appear from the proof that any one was in the actual possession when defendant’s possession commenced, nor is it satisfactorily shown when Sarah Epperson or Mrs. Tucker ceased to live in the ■ house, or whether they, or either of them, or Moreland or the plaintiff, or any other person whatever, held the actual possession when defendant entered as tenant of Hughes, though it is most probable that he immediately succeeded Moreland.
There is no error in the charge of the court that *130 “any contract or agreement between the parties about their boundaries or lines subsequent to the commencement of the suit has nothing to do with the case other than as their admissions and declarations may shed light upon the state of the case before the action was commenced.” Aside from other reasons, the defendant could not, without the consent of his landlord, either before or after the commencement of the suit, determine his tenancy by consenting to hold according to the line as run either by the plaintiff or by Blackburn, if the running of that line changed, •or was intended to change, the nature and extent of the possession delivered by Hughes or his agent.
There is not one word of evidence in the record showing or tending to prove that the defendant either took or held the possession by force or ■ unlawfully detained the same within the meaning of the statute authorizing this action. The weight of evidence shows that he was the tenant of Hughes and not of plaintiff. The case was submitted to the jury upon full and appropripate instructions by the Circuit Judge, or at least upon instructions of which the plaintiff can not complain; and, • both upon the law and facts, it appears there is no error in the judgment of the court below, and it will be affirmed.